IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Criminal No. 3:06-CR-016-D |
| VS. | § | |
| | § | |
| CHARLTON WESLEY JOHNSON, | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM OPINION
AND ORDER

The dispositive question presented by the instant motion to suppress is whether, under the totality of the circumstances, police had reasonable suspicion from the inception to effect a traffic stop of defendant's vehicle, which led to a warrantless search and the discovery and seizure of a gun, marihuana, cash, and drug paraphernalia.  Paradoxically, had police been *slower* to respond to a domestic disturbance call and to effect the stop, they likely would have had reasonable suspicion, if not probable cause, to stop the vehicle, make an arrest, and conduct a constitutionally-permissible warrantless search.  Given the limited grounds, however, on which the government relies to justify the search and seizure and the evidence developed at the suppression hearing, the court is constrained to find, for the reasons that follow,[1] that the motion must be granted.

---

[1]Pursuant to Fed. R. Crim. P. 12(d), the court sets forth in this memorandum opinion and order its essential findings.

I

On June 16, 2005, at approximately 5:30 a.m., Charles Bonet ("Bonet"), a 911 operator for the City of Balch Springs, Texas, received a family disturbance call.  A female juvenile informed Bonet that her parents were fighting.  The juvenile seemed upset, and Bonet thought she might be overhearing their altercation. Bonet dispatched the beat officer, Officer James Glover ("Officer Glover"), and a backup officer, Officer Matt Palfreyman ("Officer Palfreyman"), to the residence in Balch Springs.  It is Balch Springs policy for two officers to respond to a domestic disturbance call.

During the 911 call, the juvenile informed Bonet that the male participant——who turned out to be defendant Charlton Wesley Johnson ("Johnson")——was leaving the residence in a black vehicle. Subsequently, a female adult got on the telephone with Bonet, identified herself, and reported the male "had pulled a gun on her."  Bonet broadcast to the field officers the information about the black vehicle, and he informed them that a firearm might be involved.[2]  Although it can be inferred from Bonet's testimony that he broadcast the information about the suspect and vehicle somewhat contemporaneously with the information that the suspect had pulled

---

[2]Bonet also testified that, although he normally would have broadcast the name of the suspect, he could not be positive whether he did so in this instance.  Officer Glover likewise could not recall whether he received this information.  Whether Bonet relayed the name to Officer Glover is immaterial to the court's decision.

a gun during the dispute, as will be shown below, the hearing evidence shows that the information about the gun was not relayed to Officer Glover until after he had stopped Johnson's vehicle.[3]

When Officer Glover received Bonet's initial report of the domestic disturbance, he was approximately one-half mile away from the residence.  Because he was alone, and since Balch Springs policy required that two officers respond to a domestic disturbance call, he pulled into a restaurant parking lot within a few hundred feet of the only entrance to the residential subdivision.  After sitting there for approximately one to two minutes while awaiting the arrival of a backup officer, Officer Glover observed a black vehicle exit the subdivision.  Officer Glover was the beat officer for this subdivision.  Based on his knowledge of the location of the residence and of the time of the dispatch, the time the vehicle exited the subdivision was consistent with the time that it would have taken the vehicle to travel from the residence to the entrance.

The black vehicle turned onto Lake June Road and began accelerating.  Officer Glover felt that if he did not immediately start to follow the vehicle, he would not have the chance to stop it.  At this point in time, however, Officer Glover had been

---

[3]Moreover, the manner in which Office Glover approached Johnson's vehicle following the stop, and the action he took once advised of the possible presence of a gun, corroborate that he was unaware when he made the traffic stop that Johnson might have a weapon.

dispatched to the residence where the domestic disturbance had reportedly occurred, he had not been advised of any details of the disturbance, he knew only that the black vehicle was being driven by a male who had been involved in a family altercation, and the 911 operator had not alerted him to stop the vehicle or arrest the driver.

Officer Glover clocked Johnson driving about 35 m.p.h. when he exited the subdivision and then about 40 m.p.h. when he left the Balch Springs city limits, which are situated on Lake June Road about one block from the entrance to the subdivision. Johnson then accelerated so that Officer Glover was driving 65 m.p.h. just to catch up and close the distance between the two vehicles before initiating the stop. Before he activated the lights on his police unit, he was traveling 50 m.p.h., which is in excess of the posted speed limit. Officer Glover acknowledged that he did *not* stop Johnson because he was speeding.[4] He did so because the black vehicle had been involved in the domestic dispute.

Officer Glover's unit is equipped with a video camera that recorded the stop, ensuing arrest, and search. The government introduced the video as Gov't Ex. 1. Within about ten seconds of exiting his unit, Officer Glover approached Johnson's vehicle and

----

[4]Officer Glover testified that the acceleration occurred in the City of Dallas and that he lacked authority to stop someone for a traffic violation committed in Dallas, but these facts are essentially immaterial since he did not stop Johnson for speeding.

asked him whether he had had problems with his wife today.  He did this to verify that he had the right person.  Johnson responded that he had, but he repeatedly denied that he had done anything wrong.  Officer Glover did not display a weapon or ask Johnson immediately to exit his vehicle before questioning him.  Officer Glover then requested Johnson's driver license, which identified him as Johnson.  About three minutes into the stop, Officer Glover checked Johnson's driver license through Bonet, who cleared the license, meaning there were no pending cases, no outstanding arrest warrants, and no warrants for traffic violations.

While Officer Glover was standing by the driver's door of Johnson's vehicle, Bonet asked Officer Glover over the police radio whether he was "1012," which is a coded way of asking whether someone could overhear police radio traffic.  Officer Glover asked Bonet to wait, and he walked back to his police unit, where he learned from Bonet for the first time that a gun had been used in the domestic disturbance and it was therefore possible that Johnson might be armed.  This meant to Officer Glover that, for officer safety, he needed to pat Johnson down and check the immediate area in his car for the presence of weapons.

Officer Glover checked with his sergeant to see if he wanted him to do a pat down or felony stop due to the presence of the weapon.  He then returned to Johnson's vehicle.  Because he was concerned that Johnson might flee, Officer Glover did not draw his

weapon.  He instructed Johnson to exit his vehicle, and he patted him down, finding no weapons.   Officer Glover then instructed Johnson to step to the rear of his vehicle while he checked for the presence of weapons near the area where he was seated.  By now Officer Palfreyman and Sergeant Roger Hunt ("Sergeant Hunt") had arrived at the scene, and Officer Palfreyman guarded Johnson while Officer Glover and Sergeant Hunt searched the front passenger compartment of the vehicle.  Officer Glover discovered a loaded Colt .45 caliber pistol wedged between the right side of the driver's seat and the center console.  The handle of the pistol protruded slightly from between the seat and console approximately one-half inch or less.

The officers then handcuffed Johnson and placed him under arrest for unlawfully carrying a firearm, and Officer Glover read him his *Miranda* rights.  The officers called for a wrecker from police dispatch and commenced an inventory search of the vehicle. It is established policy in the City of Balch Springs that police inventory a vehicle when there is an arrest.  The officers discovered and seized over $1,000 in cash, quantities of marihuana, and drug paraphernalia (i.e., a scale and plastic baggies).  These items were not in plain view.

Johnson was later indicted for the offenses of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1), possession of marihuana with intent to distribute, in violation of

21 U.S.C. § 841(a)(1), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A).  On March 27, 2006 he filed a motion to suppress, in which he seeks to suppress the weapon and marihuana.[5]  The court conducted an evidentiary hearing on April 18, 2006.

## II

The Fourth Amendment protects individuals against unreasonable searches and seizures. Traffic stops are deemed seizures for the purposes of the Fourth Amendment. The legality of a traffic stop is analyzed under the framework articulated in *Terry v. Ohio,* 392 U.S. 1 (1968).  Under the two-part *Terry* reasonable suspicion inquiry, we ask whether the officer's action was: (1) justified at its inception; and (2) reasonably related in scope to the circumstances which justified the interference in the first place.  . . .  For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle. The Supreme Court has stated that in making a reasonable suspicion inquiry, a court must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing.  We have stated previously that reasonable suspicion exists when the officer can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure.  In evaluating the totality of the circumstances, a court may not consider the relevant factors

---

[5]Johnson maintains that "[t]he officers found the firearm in this case as a result of an unlawful search and seizure and therefore, the firearm (and marijuana) must be suppressed."  D. Br. 2.

> in isolation from each other. In scrutinizing
> the officer's basis for suspecting wrongdoing,
> it is clear that the officer's mere hunch will
> not suffice. It is also clear, however, that
> reasonable suspicion need not rise to the
> level of probable cause.

*United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005)

(internal quotations marks and some citations omitted), *cert.*

*denied*, ___ U.S. ___, 126 S.Ct. 1449 (2006).

The government bears the burden of establishing by a

preponderance of the evidence two elements under *Terry*: that the

stop was justified at its inception and that the Fourth Amendment

intrusions were reasonably related in scope to the circumstance

that justified the interference in the first place. *See United*

*States v. Sanchez-Pena*, 336 F.3d 431, 437 (5th Cir. 2003); *United*

*States v. Riley*, 968 F.2d 422, 424-25 (5th Cir. 1992) (addressing

warrantless search of home) ("Because a warrantless search is

presumed to be unreasonable, the Government has the burden of

proving that the warrantless search was conducted pursuant to an

exception."). For a stop to be justified at its inception, "the

officer [must have] a reasonable suspicion supported by articulable

facts that criminal activity may be afoot." *United States v.*

*Neufeld-Neufeld*, 338 F.3d 374, 378 (5th Cir. 2003) (quoting *United*

*States v. Sokolow*, 490 U.S. 1, 7 (1989)). "The concept of

reasonable suspicion . . . is not 'readily, or even usefully,

reduced to a neat set of legal rules.'" *Sokolow*, 490 U.S. at 7

(quoting *Illinois v. Gates*, 462 U.S. 213, 232 (1983)). "[T]he

- 8 -

facts giving rise to reasonable suspicion 'must be judged against an objective standard.'" *United States v. Ibarra-Sanchez*, 199 F.3d 753, 758 (5th Cir. 1999) (quoting *Terry*, 392 U.S. at 21-22). "[T]he constitutional reasonableness of the stop does not depend upon the actual motivations of the officer involved." *Sanchez-Pena*, 336 F.3d at 437.

III

A

The government in its pre-hearing response brief advanced two alternative contentions for why the stop of Johnson's vehicle was justified at its inception.  First, and primarily, it contended that Officer Glover observed Johnson speeding, and therefore had a basis to stop him for a traffic violation committed in the officer's presence.  *See* Gov't Br. 6 (citing Tex. Transp. Code Ann. § 545.352 (Vernon Supp. 2005)).  At the hearing, however, Officer Glover candidly testified that he *did not* stop Johnson for speeding but instead did so because his vehicle was involved in the domestic disturbance.  Second, the government contended that "Officer Glover had reasonable suspicion to believe that the occupant of the vehicle was the individual who was involved in the aggravated assault call."  *Id.* at 7.  The court will therefore address the government's alternative argument.[6]  In doing so, the court will

---

[6]The entirety of the government's argument that the stop was reasonable based on the domestic disturbance call is set forth below.

evaluate the evidence under the totality of the circumstances to determine whether Officer Glover had a reasonable suspicion that supported the stop of Johnson's vehicle.

B

Officer Glover testified that he effected the stop because he had received a dispatch of a "domestic disturbance" at a residence, and the black vehicle was involved in the dispute.  Notwithstanding Johnson's contrary argument, the court finds that it was reasonable for Officer Glover to suspect that the black vehicle that he observed exiting the subdivision was the same one that dispatch had reported was involved.  Officer Glover was the beat officer for the housing subdivision and very familiar with it, the subdivision was

---

In addition, Officer Glover had reasonable suspicion to believe that the occupant of the vehicle was the individual who was involved in the aggravated assault call.  The Fifth Circuit has explained [block quotation from *Lopez-Moreno* omitted].  Here, the totality of the circumstances show that Officer Glover had a "particularized and objective basis" for suspecting legal wrongdoing.  Officer Glover was dispatched to 2404 Spring Meadow in Balch Springs, Texas, and was parked [next] to the only possible exit from the subdivision.  He was informed that the individual who committed the assault on his wife was leaving the subdivision in a black car and, a short time later, saw a black car leave the only exit of the subdivision and accelerate rapidly.  Accordingly, Officer Glover had sufficient reasonable suspicion to justify the traffic stop.

Gov't Br. 7-8.

relatively small, and it had but one entrance.  He arrived near the entrance very soon after he received the dispatch, the time the vehicle exited the subdivision coincided with the time that would have elapsed for travel from the residence in question to the entrance, and at the early hour of approximately 5:45 a.m., it would be unlikely that another black vehicle would exit the small subdivision at precisely, or very close to, the same time.

This finding, however, although pertinent to one of the principal grounds of Johnson's suppression motion, does not answer the dispositive question.  Officer Glover must still be able to point to specific and articulable facts that, taken together with rational inferences from those facts, gave him an objectively reasonable suspicion——*prior to* stopping the vehicle——that criminal activity was afoot——i.e., that the person stopped had committed, was in the process of committing, or in the future would commit *a crime*.  The stop must have been justified from its inception.  He failed to do so.

Officer Glover did not testify that, when he responded to the dispatch, he suspected that any crime had been, was being, or would be committed.  He simply stated that he stopped Johnson's vehicle because it was involved in the domestic dispute.  Essentially, Officer Glover, who was dispatched to a residence to handle a domestic disturbance and was waiting for a backup officer, decided to effect a stop of one of the persons allegedly involved in the

disturbance.  But when he did so, he had no information that the person had committed a crime or, for that matter, had done anything more than participate in an altercation.[7]

Moreover, the government did not elicit testimony from Officer Glover about his past experiences responding to domestic disturbance calls during his more than eighteen years as a Balch Springs police officer.  Such testimony might have established, under the totality of the circumstances, that he reasonably suspected that Johnson had in fact engaged in criminal conduct, even if his knowledge would have been insufficient to rise to the level of probable cause.  *Cf. Sanchez-Pena*, 336 F.3d at 437 ("We traditionally give due deference to the experience of officers . . . in identifying a number of factors that, although insufficient by themselves to suggest illegal activity, taken together are indicia of certain types of illicit acts.").

In other cases where courts have concluded that officers possessed reasonable suspicion to stop suspects in response to 911 domestic disturbance calls, the officers articulated important facts that are not present here.  In *United States v. Dotson*, 102 Fed. Appx. 508 (7th Cir. 2004) (per curiam) (unpublished order),

---

[7]The court in no way intends to minimize the serious nature of domestic disturbances and the abusive conduct to which some participants (often women) are subjected.  Here, however, the government failed to adduce evidence that, at the inception of the stop, Officer Glover had a basis reasonably to suspect that Johnson had engaged in criminal conduct.

*rev'd on other grounds*, 543 U.S. 1110 (2005), the officers received a bystander tip that a participant in a domestic dispute had a gun. *Id.* At the time of the instant stop, however, Officer Glover lacked this crucial piece of information. *Cf. United States v. Pardue*, 270 F.Supp.2d 61, 65 (D. Me. 2003) (upholding investigative detention of defendant based on reasonable suspicion where officer responding to domestic disturbance dispatch had "reasonable suspicion to believe that an assault may have been committed based on the dispatcher's report that an object, in this case a lighter, had been thrown at the complainant"), *aff'd*, 385 F.3d 101 (1st Cir. 2004), *cert. denied*, 543 U.S. 1169 (2005). In *United States v. Lincoln*, 141 Fed. Appx. 634 (9th Cir. 2005) (per curiam) (unpublished mem.), *cert. denied*, ___ U.S. ___, 126 S.Ct. 1177 (2006), in responding to a domestic disturbance call, the officers had responded the night before to a similar domestic disturbance at the same residence and knew the suspect was an alleged drug dealer, that drug dealers often carry guns, and that domestic disturbances often escalate into violent situations. *Id.* at 635-36. Here, Officer Glover stated that he had never met Johnson before the stop, and he did not mention that he suspected that the driver of the black vehicle was a drug dealer.

At the hearing, the government contended that Officer Glover had reasonable suspicion to stop the black vehicle because he suspected that the occupant had committed an aggravated assault

under Texas law.  The court disagrees.  The evidence establishes
that Officer Glover did not learn about the possible use of a gun
during the domestic disturbance until *after* he had effected the
stop.  The manner in which Office Glover approached Johnson's
vehicle following the stop, and the action he took once advised of
the possible presence of a gun, corroborate that he was unaware of
the possible presence of a weapon when he stopped Johnson's
vehicle.  The evidence that the government developed at the hearing
reflects no reasonable basis for Officer Glover to suspect that an
aggravated assault had occurred before he stopped Johnson.  Indeed,
Officer Glover never testified that he thought the driver of the
black vehicle was involved in an aggravated assault.[8]

---

[8]Although not binding authority on this court, the decision in
*McCraw v. Texas*, 117 S.W.3d 47 (Tex. App. 2003, pet. denied), is
instructive.  In *McCraw* the court of appeals reversed a conviction
for unlawfully carrying a firearm, concluding that the defendant's
motion to suppress should have been granted.  *Id.* at 50, 55.  In
*McCraw* a deputy responded to a domestic disturbance call.  En route
he encountered the defendant, who had left the residence and had
signaled the deputy, and determined from questioning him and from
a plain view search of his vehicle that he did not possess a
weapon.  The deputy arrested the defendant in front of his home,
however, after the dispatcher notified the deputy that the victim
had not been injured but that the defendant might have a weapon.
*Id.* at 53.
     So far as pertinent to the present case, the court of appeals
held that the defendant's warrantless arrest was unlawful.  *Id.* at
54.  Because he was arrested before deputies located a weapon in
his vehicle, the discovery of the weapon could not serve to support
probable cause for the arrest.  The court therefore addressed
whether the deputy could have arrested the defendant based on the
available facts and circumstances concerning the alleged commission
of an assault.  The court reasoned that, in Texas, a police officer
may only arrest an individual without a warrant if there is
probable cause with respect to that individual, and the arrest

At the time he effected the stop, Officer Glover had no information that the alleged victim in the domestic dispute had suffered any bodily injury, or that Johnson had possessed (and might still have) a weapon, or that Johnson had committed an aggravated assault by brandishing a weapon.  In the circumstances of this case, the absence of this information is critical to the court's finding that the stop was effected without reasonable suspicion.  Without knowing that a gun was involved (or, for that matter, any other suspicious facts), Officer Glover lacked reasonable suspicion that activity that was *criminal* in nature was

---

falls within one of the exceptions specified in the Texas Code of Criminal Procedure.  In the context of *McCraw*, for the officer to have effected a warrantless arrest for an assault, the assault must either have occurred in the officer's presence or view or he must have had probable cause to believe that the assault resulted in bodily injury to a member of the suspect's family or household. *Id*.  Based on the 911 call and the deputy's encounter with the defendant, the deputy had probable cause to believe the defendant had been involved in a domestic disturbance. But the alleged assault did not occur in the deputy's presence or view.  And before arriving at the residence, the deputy was informed that the victim had not suffered bodily injury.  The court therefore held that, absent a warrant, the deputies could not lawfully arrest the defendant for assault. *Id*.  Because the defendant was illegally arrested before the deputies searched his vehicle, the search of his van was also unlawful. *Id.* at 54–55.

Although *McCraw* can be distinguished from the present case (for example, it addresses probable cause rather than reasonable suspicion), it tends to corroborate why Officer Glover would have lacked a legal basis to stop Johnson based merely on the report that he had been involved in a domestic dispute. *McCraw* supports rejecting the government's assertion that Officer Glover could have reasonably suspected that Johnson had left the scene of an aggravated assault where there was no indication that he had brandished a weapon or inflicted bodily injury.

afoot.[9]  Officer Glover articulated no reasons to suspect that the
driver of the black vehicle had committed, was in the process of
committing, or in the future would commit a crime.  Having analyzed
the evidence under the totality of the circumstances, the court
finds that the government has failed to meet its burden of proving
by a preponderance of the evidence that the stop of Johnson's
vehicle was based on reasonable suspicion.

C

The court is of course aware that "[t]he Supreme Court has
established four exceptions to the exclusionary rule that allow for
the admission of evidence" obtained in violation of the Fourth

---

[9]The court is aware that there are instances where the
collective knowledge doctrine applies and the government can rely
on the collective knowledge of police officers rather than the
knowledge of the officer who made the stop.  The government does
not contend, however, that it relies on the knowledge that 911
operator Bonet may have had that a gun was involved in the domestic
dispute, even if Officer Glover was not yet aware of that fact.  It
has therefore waived this argument.  Moreover, the government
failed to proffer evidence from which a reasonable inference could
be drawn that Bonet in fact knew that the gun was involved in the
domestic disturbance before Officer Glover effected the stop.  It
is more reasonable to infer that this type of information would
have been relayed immediately to officers in the field.  And
Officer Glover was not advised that Johnson might be armed until
*after* he stopped his vehicle.  Furthermore, had the argument been
made and not waived, the government would then be obligated to
demonstrate that the collective knowledge doctrine should extend to
a 911 operator who had one week of training for that position and
as to whom there was no evidence that he had any law enforcement
training.  *See United States v. Colon*, 250 F.3d 130, 137 (2d Cir.
2001) (holding that 911 operator's knowledge could not be relied on
to satisfy collective knowledge requirement absent evidence that
operator was capable of determining whether there was reasonable
suspicion for stop and frisk).

Amendment.  *United States v. Sheppard*, 901 F.2d 1230, 1234 (5th Cir. 1990).  And, in deciding this motion, the court has not disregarded the possibility that an exception could have applied had it been raised.  For example, as the court notes above, paradoxically, had Officer Glover been *slower* to respond to the domestic disturbance call, he would likely have learned of the allegation that Johnson had used a weapon during the domestic disturbance and would have had reasonable suspicion, if not probable cause, to effect the stop.  But the government did not contend—either in its pre-hearing brief or during argument at the suppression hearing—that any exception applies in this case. Because the government has the burden of proving that an exception to the exclusionary rule applies, *see, e.g., Riley*, 968 F.2d at 424-25, the court assumes the government determined that it cannot justify such an exception.  It therefore waived any argument that an exception to the exclusionary rule applies in this case.

Because Officer Glover lacked reasonable suspicion from the inception to stop Johnson's vehicle, the arrest and search that followed violated the Fourth Amendment.  *See, e.g., United States v. Jaquez*, 421 F.3d 338, 341-42 (5th Cir. 2005) (per curiam) (holding that police did not have reasonable suspicion to make investigative stop of defendant's car and that stop and subsequent search violated defendant's Fourth Amendment right to be free of unreasonable searches and seizures).  Johnson's motion to suppress

the weapon and marihuana seized during the search must be granted.

* * *

For the reasons stated, the court grants Johnson's March 26, 2006 motion to suppress.

**SO ORDERED.**

April 20, 2006.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE